IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 16, 2013

**STATE OF TENNESSEE v. CORY LEE JACKSON**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-A-637     Mark J. Fishburn, Judge**

**No. M2012-00943-CCA-R3-CD - Filed November 26, 2013**

The Defendant-Appellant, Cory Lee Jackson, was indicted by a Davidson County Grand Jury for theft of property valued at $10,000 or more but less than $60,000. At trial, the jury convicted Jackson of the lesser included offense of theft of property valued at $1000 or more but less than $10,000, a Class D felony. See T.C.A. § 39-14-103(a), -105(a)(3). The trial court sentenced him as a Range II, multiple offender to six years in confinement. On appeal, Jackson argues: (1) the evidence is insufficient to sustain his conviction; (2) the trial court abused its discretion in admitting evidence of his missed court dates on unrelated charges; (3) the trial court abused its discretion in admitting testimony regarding Budget's loss regarding the rental vehicle; and (4) his sentence was excessive. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and ROGER A. PAGE, JJ., joined.

Joshua L. Brand, for the Defendant-Appellant, Cory Lee Jackson.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Sarah N. Davis, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Trial.** On July 3, 2010, Jackson rented a Chevrolet Impala, worth $26,998, from a Budget Rent-A-Car (Budget) in Madison, Tennessee. Jackson presented his driver's license and a debit card, signed a rental agreement, and paid $31.96 to rent the car for one day. The rental agreement required Jackson to return the car to the Madison location and to receive

preapproval for any extensions regarding the length of his rental period. At some point, Jackson contacted Budget and received approval to extend the rental term to July 10, 2010. Jackson did not return the car on July 10, 2010, and did not request another extension.

Scott Darr, territory performance manager for Avis Budget Group in Nashville, testified that he managed and supervised all of the corporate locations within the Middle Tennessee district and handled situations in which rental cars were not returned. He stated that he assisted the loss prevention department in recovering the value of any stolen rental cars and in obtaining the warrants from the police department after receiving the current value of the rental car from the corporate office. Darr said that Budget keeps a record of the value of each of their cars as a business practice. Once a car is not returned, Budget's loss prevention department informs him of what "action needs to be taken." Darr confirmed that Budget's rental agreements allowed for customers to drive its rental cars across state lines. He also said that the only permissible way to extend a rental period was to contact Budget.

Darr stated that the Impala had a value of $26,998 at the time that Jackson signed the rental agreement. Budget had no record of giving Jackson any additional extensions following the first extension. When Jackson failed to return the rental on July 10, 2010, the loss prevention department attempted to contact him for the purpose of recovering the car. From July 13, 2010, to August 6, 2010, employees at Budget's loss prevention department tried unsuccessfully to call Jackson thirteen times at the number he had provided before realizing that Jackson's telephone number was no longer in service. Darr stated that Jackson never provided a second telephone number where he could be reached. Also on July 13, 2010, Budget sent Jackson a certified letter to the address provided by him. However, no one at the address accepted the letter or responded to the notice.

On August 3, 2010, Budget employees mailed another certified letter to an alternate address where they believed Jackson could be reached. This second letter, like the first one, informed Jackson of the legal consequences of failing to return Budget's vehicle. Although this second letter was delivered on August 6, 2010, Jackson never contacted Budget. Darr stated that Budget's loss prevention department then contacted Jackson's debit card company to verify that the address that Jackson had given Budget was the same address he had given to this company. The debit card company told the loss prevention department that the address Jackson had given to Budget did not match the address they had on file but that the phone number he had given to Budget did match the debit card company's records. However, the company refused to disclose whether Jackson's debit card account was active. When Budget's loss prevention department tried to charge this account on July 13, 2010, Jackson's card was declined.

Budget's Missing Vehicle Report showed that Budget conducted a driver's license

check and a "skip trace" in an effort to locate Jackson and the rented vehicle. In addition, Budget contracted with a repossession company to determine whether the rental car was located at the address given by Jackson. Once the loss prevention department followed all of its procedures for recovery of the rental vehicle, it sent Darr a package with instructions to contact the police to report the car missing. On August 10, 2010, Darr met with Detective Robert Bristol of the Metropolitan Nashville Police Department and obtained a warrant against Jackson for theft of property. He stated that once he got a police report number, Budget's loss prevention department contacted OnStar, who located the rental car in Los Angeles using its tracking device. The car was recovered by police almost immediately.

Darr stated that Jackson had possession of the rental car from July 10, 2010, to August 12, 2010, without Budget's consent. He also stated that the loss prevention department calculated Budget's losses regarding the rental car to be $2,376.95, which included lost rental fees for the vehicle, expenses associated with recovering the vehicle, towing and storage fees, fuel expenses, and $642.88 in damage to the car.

On cross-examination, Darr stated that when a customer requests an extension of a rental car, an employee enters that information into the computer. In addition, when a customer initially rents a car, a hold is placed on the customer's credit card in order to secure payment of the rental, and the balance of the rental is paid at the conclusion of the rental period. He acknowledged that there had been situations in the past where a customer returned a rental car and paid all outstanding fees just hours before he was going to report the car missing to the police.

Darr stated that the address where the first certified letter was mailed also matched the address on Jackson's driver's license. He acknowledged that although the first letter was unable to be delivered, he did not have any reason to believe that Jackson lied about living at that address. Darr said he did not know whether the second letter was left at the address or hand-delivered to Jackson, but he acknowledged that he had no proof that Jackson actually received this second letter. He admitted that Jackson had failed to return other rental cars on time in the past and that this was the first time that Budget had reported a car rented to Jackson as missing. He also admitted that although Budget's Missing Vehicle Report showed that there was no damage to the rental car at the time it was recovered, he never observed the car himself, and the damage amount of $642.88 came from Budget's loss prevention department.

On redirect examination, Darr stated that if anyone from Budget Rent-A-Car granted Jackson an oral extension, it would have been against Budget's policy and procedures. Based on his investigation, no one at Budget gave Jackson an oral extension or converted his rental to a one-way rental allowing him to return the car in California. He added that if

-3-

someone had given Jackson permission to return the car in California, it would have been noted in the computer and would have resulted in a "substantial change in the rate."

Robert Bristol, a retired detective with the Metropolitan Nashville Police Department, testified that Darr met with him on August 10, 2010, to obtain warrant for the theft of a white Chevrolet Impala that had been rented by Jackson. Detective Bristol determined that Darr needed to obtain a theft warrant because Jackson had an unrelated outstanding warrant at the time and the rental car had been missing for a month. A short time after Darr obtained the warrant, the rental car was located and Jackson was arrested on the same day in Los Angeles County, California. Jackson was released from jail in California before Davidson County obtained permission from the district attorney's office to have him extradited.

On cross-examination, Detective Bristol acknowledged that the contact information from Jackson's driver's license matched the information Jackson had given to Budget at the time he rented the car. He stated that he tried to contact Jackson by phone before Darr obtained the theft warrant against him, but he was unable to reach him.

Jere Jordan, a bonding agent and officer manager for Rader Bonding Company, testified that his company posted bonds for Jackson beginning in February 2010. Jordan stated that Jackson appeared at three court dates in March and May before missing his court dates on July 26, 2010, and July 27, 2010. Jordan stated that Jackson would have been informed about his July court dates at his court appearances in May and that the bonding company attempted to inform Jackson of his July court dates but discovered that Jackson's telephone number had been disconnected. Jordan said that when Jackson missed his court dates on July 26 and 27, the bonding company contacted Jackson's grandmother, a co-signer on his bond, who disclosed that she had lost contact with him. Other contacts that Jackson had listed on his bonding documents did not prove to be helpful in locating him. Jordan said that the bonding company eventually contacted an outside agency to locate Jackson. In August 2010, the bonding company received information indicating that Jackson was in California. The company contacted the district attorney's office in Nashville to ensure that Jackson was placed on the national registry that informs other jurisdictions of outstanding warrants. Although the district attorney's office placed him on this registry by Monday morning, Jackson had already been released from jail in California earlier that morning before he could be extradited. Jordan stated that the outside agency in California eventually located Jackson and brought him back to Tennessee in November 2010.

Jackson, the Defendant-Appellant, testified that he operated a moving company with Keith and Michelle Bolgery from November 2008 to November 2009. He stated that the company did not own a moving truck but rented them from Budget at the Madison, Tennessee location. Jackson said that he rented trucks from Budget three to four times a

week and that he had never had any problems with the rental company during that time. Jackson explained that the telephone number he provided to Budget to rent the Chevrolet Impala was the number for his company phone that was paid by the Bolgerys. He said even after the moving company went out of business, the Bolgerys continued to pay his telephone bill. Jackson stated that after the moving company stopped doing business, he started a transportation company and began renting cars daily from the Budget location in Madison.

Jackson said Budget offered him good deals for the rentals, and he developed a professional relationship with Mark Stephen, the Budget manager for the Madison location. He stated that he always rented cars from Budget for a single day but often received extensions on the rentals, even if he had not specifically requested these extensions. He asserted that if he ever wanted to keep a rental longer than the original term, "my relationship with them was good enough to where they just kept extending it." He added that Budget had told him that he would get charged $10 for the extension, and if he had the car longer than one month, he would be charged maintenance fees. He also stated that Budget informed him that if he returned the car to another Budget location, he would be charged a $300 fee for the one-way rental and the extensions. Jackson stated that he often traveled as far as Florida and Texas while operating his transportation company. Until this case, he said he had never had Budget file a missing vehicle report if he kept the car for longer than the time period in the rental agreement and asserted that he had kept two different Budget rental cars for five or six weeks each around February or March 2010. Jackson said he always paid for the cars when he returned them, and he never paid the entire fee for a car at the beginning of the rental period.

Jackson stated that when he rented the Chevrolet Impala, he provided Budget with the same debit card he had been using for his other rentals. At the time he rented the Impala, the phone number that he gave to Budget was a working number, and he had no reason to believe that it would be disconnected. Jackson said that around the time he rented the Impala, he began spending less time with the Bolgerys because his business started doing well. However, the Bolgerys continued to pay his cell phone bill. Jackson said that after he rented the Impala, he planned to move his business to Hollywood for a short time while he tried to get discovered as an actor. Once he arrived in California, he realized that it was more expensive that he anticipated and discovered that he was unable to operate his business because he did not have the proper license. He also discovered that his cell phone had been disconnected. Jackson asserted that he never intended to stay in California and was going to return the car to the Budget location close to where he was staying and pay the rental fees. His "plan was to hurry up and try to get a job and take my paycheck and go to Budget and try to keep that relationship[.]"

Jackson stated that he found a job in California and was arrested exactly one week

after he began working. He acknowledged that his first paycheck would not have covered the total amount that he owed to Budget and that he had been in possession of Budget's rental car for five weeks at the time of his arrest. He admitted that he never tried to call Budget but asserted that he was trying to save money so he could pay for the rental car. Jackson stated that he never received any phone calls or letters from Budget and never had any reason to believe that Budget had reported his rental car missing or stolen. He said he knew that Budget could use OnStar to locate the vehicle and that the thought of his running away from the world with Budget's rental car was "preposterious." Jackson asserted that he did not appear for his court dates on July 26, 2010, and July 27, 2010, because he thought they were in October. He claimed that when he was arrested, he had no idea he had outstanding warrants for failing to appear in court and for theft of a vehicle. Jackson said he never intended to keep the car for his own use without paying Budget.

On cross-examination, Jackson claimed that he never contacted his ex-business partners, the Bolgerys, to get the Budget rental agreements associated with the moving business because the Bolgerys' phone number was in the phone that was disconnected and he did not know their address. He said that he was without a cell phone during his entire stay in California and did not call his wife during that time because they were not "on good terms[.]" Although he initially claimed that he went to California to take "a break from everything," he admitted that his wife had obtained an order of protection against him before he left for California. He acknowledged that several of his outstanding warrants were for violations of this order of protection. He also acknowledged that Budget had told him on prior occasions that if he wanted to extend the length of his rental he had to request an extension over the phone and provide a valid credit card and valid contact information. Jackson admitted that he did not have an agreement with Budget that granted him an exception to these rules. Instead, he claimed that Budget had failed to enforce these rules with his prior rentals and that Mark Stephan, the manager at the Madison location, allowed him to keep cars without following all of Budget's rules. He acknowledged that he never called Stephan to resolve the situation with the Chevrolet Impala. Jackson denied extending his rental by a week and claimed that an employee at Budget must have done the extension without speaking with him because that was what had occurred for his other rentals in the past. He admitted that he did not have anyone from Budget to confirm these prior extensions. Jackson said he did not have copies of the hundreds of rental agreements he signed with Budget prior to this rental because he had been in jail.

Jackson stated that if he had been planning on fleeing to California, he would not have taken a rental car registered in his name that had the OnStar service. When the State asked Jackson why he failed to tell anyone that he was going to California to become an actor, he said he did not intend to permanently move to California and was just taking a vacation. However, once he got to California, things started going wrong and he "got stuck and then

it was about survival[.]" Jackson admitted that he did not give Budget any information regarding his stay in California and did not return to Tennessee until bounty hunters brought him back to the state.

On redirect examination, Jackson stated that when his attorney attempted to subpoena all of his rental agreements from Budget, Budget failed to provide these documents. In addition, when his attorney tried to find Mark Stephan, Budget informed him that Stephan was no longer working at the company, and no one knew how to contact him. Jackson stated that if given the opportunity, he would like to pay the amount he owed to Budget for the rental car. Following the close of proof, the jury convicted Jackson of theft of property valued at $1000 or more but less than $10,000.

**Sentencing Hearing.** At the beginning of the sentencing hearing, the State entered the presentence investigation report into evidence and presented brief testimony from Amy Simmons, the probation officer who prepared the presentence report. The defense did not present any proof at sentencing. However, defense counsel asked the court to consider Jackson's testimony at trial, where he explained his conduct and offered to pay restitution to Budget. At the conclusion of the hearing, the trial court sentenced Jackson as a Range II, multiple offender to six years in confinement. Jackson filed a timely motion for new trial and amended motion for new trial, which were denied. He then filed a timely notice of appeal.

## ANALYSIS

**I. Sufficiency of the Evidence.** Jackson asserts that the evidence is insufficient to sustain his conviction for theft. The State responds that the evidence, when viewed in the light most favorable to the State, proves the elements of the offense beyond a reasonable doubt. We agree that the evidence is sufficient to sustain Jackson's conviction.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331

(Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

In this case, Jackson was convicted of theft of a Budget rental car. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). As relevant in this case, the term "deprive" means to "[w]ithhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner." Id. § 39-11-106(a)(8)(A). Theft of property valued at $1000 or more but less than $10,000 is a Class D felony. Id. § 39-14-105(a)(3).

First, Jackson argues that the evidence is insufficient to demonstrate that he knowingly obtained control of the rental vehicle without Budget's consent. He claims that "[t]here is no evidence that [he] knew or had any reason to know that he did not have the owner's consent to maintain control over the rental vehicle." As support for this assertion, he notes that he had a history of renting cars from Budget, that he had Budget's consent when he initially took control of the car, and that Budget's rental agreements allowed for a renter to pay his full balance at the end of the rental period. Moreover, he claims that the evidence established that he had returned cars late to Budget on previous occasions and that Budget had never reported these prior rentals as missing. Furthermore, Jackson argues that there was no proof that he intended to evade contact with Budget, only that he never received notice from Budget. He asserts that the fact that his cell phone service had been terminated, that he did not receive either of the two certified letters sent by Budget, and that debit card he used to rent the car was overdrawn by the time he reached California all support his argument that he did not know that he was acting without Budget's consent in keeping the vehicle.

Second, Jackson argues that the evidence is insufficient to demonstrate that he intended to permanently deprive Budget of its rental car. He claims that he originally rented the car with valid contact information and a valid rental agreement. He asserts that driving

-8-

the rental car to California and paying for the car upon its return was permissible under Budget's rental agreement. He also claims that because his previous overdue rentals were not reported missing or stolen, he lacked the intent to permanently deprive Budget of its car in this case. Jackson again claims that he was merely "out of contact" with Budget rather than "avoiding contact" with them. In addition, he argues that he made no attempt to evade police when he was arrested in close proximity to the rental car and that he knew the OnStar system would allow law enforcement to find the car immediately. Jackson argues that because the evidence failed to show that he intended to permanently deprive Budget of its vehicle, the only offense for which he should have been convicted was the crime of unauthorized use of a motor vehicle. See id. § 39-14-106 ("A person commits a Class A misdemeanor who takes another's automobile, airplane, motorcycle, bicycle, boat or other vehicle without the consent of the owner and the person does not have the intent to deprive the owner thereof.").

Here, the proof at trial showed that on July 3, 2010, Jackson signed a rental agreement with Budget Rent-A-Car to rent a Chevrolet Impala for one day for the amount of $31.96. He later contacted Budget and received an extension of the rental term to July 10, 2010. However, Jackson failed to return the rental car on this date, failed to contact Budget for an extension, and failed to pay for his continued use of the rental vehicle. When Budget tried to contact Jackson by phone, the company found that Jackson's cell phone had been disconnected. When Budget sent Jackson two certified letters, one letter was returned as undeliverable and the other letter was delivered to an unidentified individual at that address. Budget then tried to charge Jackson's debit card, which was declined. After Jackson rented the Impala, he missed court dates for unrelated charges on July 26, 2010, and July 27, 2010.

On August 10, 2010, four weeks after the date Jackson was required to return the car, Budget contacted the Nashville Metropolitan Police Department and reported the car missing. Once Budget acquired a police report number, it contacted OnStar with this information, and OnStar located the vehicle in California. Jackson was arrested the same day in close proximity to the vehicle. Upon review, we conclude that these facts were sufficient for the jury to infer that Jackson knowingly obtained control of the vehicle without Budget's consent and that he intended to deprive Budget of its rental car. See State v. William Belchia, No. W2004-01168-CCA-R3-CD, 2005 WL 729166, at *3 (Tenn. Crim. App. Mar. 30, 2005) (concluding that the evidence was sufficient to support the defendant's conviction for theft of property when the defendant kept the rental car for thirty days beyond its due date, damaged the rental car, failed to respond to the rental company's efforts to contact him, and failed to contact the rental company about extending the length of the rental term, explaining his failure to return the car, or paying for his continued use of the car); State v. Tammy Annette Burruss, No. M2002-01261- CCA-R3-CD, 2003 WL 21516211, at *3 (Tenn. Crim. App. July 2, 2003) (affirming the theft conviction when the evidence at trial

showed that the defendant rented the car for one day, kept the rental car twenty-seven days beyond the return date, failed to contact the rental company to explain why she still had the car, failed to respond to the rental company's attempts to contact her, and attempted to evade a police officer who discovered the rental car in her possession); State v. Virginia Wagner, No. CCA-03C01-9307-CR-002, 1993 WL 523400, at *2 (Tenn. Crim. App. Dec. 17, 1993) (holding that the evidence was sufficient to sustain the conviction for theft of property when the defendant failed to return the rental car at the end of the thirty-day term and the rental car, at the time of its recovery, had been painted and had a new license tag). Although Jackson attempted to explain his conduct at trial, it was the jury's prerogative to reject this explanation and accredit the testimony from the State's witnesses. As we previously noted, we will not "reweigh or reevaluate the evidence." Henley, 960 S.W.2d at 578-79. Accordingly, we conclude that the evidence was sufficient to support Jackson's conviction for theft of property valued at $1000 or more but less than $10,000 beyond a reasonable doubt.

Third, Jackson contends that because the jury convicted him of the lesser included offense of theft of property valued at more than $1000 and less than $10,000 based on lost rental value and reclamation fees totaling $2,376.95 rather than the charged offense of theft of property based on the car's value of $26,998, his conviction should be reversed. He argues that the jury found that he intended to deprive Budget of the rental value of the car for thirty days rather than that he intended to permanently deprive Budget of its rental car. Value is defined as "(i) [t]he fair market value of the property or service at the time and place of the offense; or (ii) [i]f the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense[.]" Id. § 39-11-106(a)(36)(A). The jury determines the fair market value of the property "at the time and place of the theft[.]" State v. Hamm, 611 S.W.2d 826, 828-29 (Tenn. 1981). We decline to speculate as to the reasoning behind the jury's verdict in this case. Because the record contains ample proof supporting the jury's finding that the value of the car was $1000 or more but less than $10,000 at the time of the theft, the evidence is sufficient to support Jackson's conviction. He is not entitled to relief.

Fourth, Jackson argues that the jury found he only intended to deprive Budget of the lost rental value of the car in violation of Tennessee Code Annotated section 55-5-104(c), rather than that he intended to deprive Budget of its property pursuant to Code section 39-14-103(a). As support for this argument, Jackson asserts that there was no proof presented showing that Jackson's actual damage to Budget's car was $1000 or more. We initially note that the jury was never instructed on the offense in Code section 55-5-104(c), which provides: "Any person who, after hiring, leasing or renting a motor vehicle under an agreement in writing, which provides for return of the vehicle to a particular place, or at a particular time, abandons this vehicle, or refuses or willfully neglects to return the vehicle

to the place and at the time specified in the agreement, or who secretes, converts, sells or attempts to sell the motor vehicle, or any part of the motor vehicle, commits a Class E felony." Interestingly, Jackson does not argue that the trial court erred in not instructing the jury on this offense but instead asserts that the evidence is insufficient to support his conviction of theft of property because he lacked the intent to deprive Budget of its property. Because we have already concluded that the evidence is sufficient to support Jackson's conviction, he is not entitled to relief. Viewing the evidence in the light most favorable to the State, we conclude that a jury could have found that Jackson committed the offense of theft of property valued at $1000 or more but less than $10,000 beyond a reasonable doubt.

**II. Admission of Jackson's Missed Court Dates.** Jackson argues that the trial court erred in admitting evidence of his missed court dates on unrelated charges while in possession of the rental car because this evidence amounted to inadmissible character evidence. Specifically, he contends that the trial court failed to substantially comply with the strict requirements of Tennessee Rule of Evidence 404(b) because the court never made a clear determination that a material issue existed, never stated which issue was being addressed, and never determined that the other acts were established by clear and convincing evidence. He also asserts that although the trial court's ruling mentioned that limited evidence of Jackson's failure to appear at the court dates might have probative value, the court failed to weigh this probative value against the prejudicial effect of presenting evidence of Jackson's other crimes. In response, the State argues that the trial court did not abuse its discretion in admitting this evidence because the court conducted the required hearing before determining that Jackson's missed court dates were probative of his intent not to return the vehicle. Upon review, we conclude that the trial court did not abuse its discretion in admitting this evidence.

Jackson argues that the State failed to explain how his missed court dates on unrelated charges would have shown motive or intent to run. In addition, he asserts that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice because his recent, prior arrests "simply painted [him] as a criminal more likely to engage in criminal activity." Although Jackson acknowledges that the trial court limited the evidence in an attempt to keep the jury from inferring that he was on a crime spree when he took the rental car, he argues that the court committed reversible error when it allowed the State to present evidence of his prior crimes.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion

that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006).

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)).

We note that evidence of a defendant's character offered for the purpose of proving that he or she acted in conformity with that character is inadmissible. See Tenn. R. Evid. 404(a). However, evidence of other crimes, wrongs, or bad acts may be admissible for other purposes if this evidence satisfies the conditions in Rule 404(b).

Rule 404(b) states:

**Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The term "other purposes" in the aforementioned rule has been defined to include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (citing State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201, at *2 (Tenn. Crim. App. Jan. 22, 2003)).

We note that "Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible." State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Rule 404 "establish[es] that character evidence cannot be used to prove that a person has a propensity to commit a crime." Id. (citing Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994)). Trial courts should take a "restrictive approach [to] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). The more similar the conduct or act to the crime for which the defendant is on trial, the greater the potential for a prejudicial result. McCary, 119 S.W.3d at 243 (citing State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995)).

Here, the State filed a motion entitled "Notice of Intent to Introduce Evidence Consisting of Other Crimes, Wrongs, or Acts of the Defendant," wherein the State requested that the court allow Jere Jordan, an agent for Rader Bonding Company, to testify that Jackson had been on bond for other unrelated criminal charges prior to his car rental and that he missed court dates for these charges while in possession of Budget's rental car. The State argued that this evidence was admissible under Rule 404(b) because it showed Jackson's motive or intent to permanently deprive Budget of ownership of its rental car.

At a hearing outside the presence of the jury, Jordan testified that he had made bonds for Jackson in February and June of 2010. He stated that although Jackson appeared at all of his other court dates, he failed to appear in court on July 26, 2010, and July 27, 2010, and his bond was forfeited in those cases. Jordan stated that his bonding company attempted to reach Jackson on July 25, 2010, but the number he had provided had been disconnected. The company then called a second number that Jackson had provided, and the person that answered that number said they did not know him. The bonding company next contacted Jackson's grandmother, who stated that she had lost contact with him and that no one had heard from him in a while. After Jackson's bonds were forfeited, Jordan said that the company tried to contact people that knew Jackson because Jackson had missed a court date on a prior offense and had turned himself in on that bond. Jordan said that in August 2010, the company received information that Jackson had been incarcerated in California but was

released before he was extradited. Eventually, the bonding company learned that Jackson was probably with his wife in California who was pregnant with his child. At that point, the bonding company contacted an outside agency to determine if someone in California might be able to help them locate Jackson. This agency found Jackson around November 18, 2010, in Van Nuys, California and returned him to Tennessee, where he was served with the charges in this case.

The State argued that the fact that Jackson had missed his court dates in July was relevant to his motive and intent not to return the rental car because "he was on the run, so to speak." Defense counsel responded that the State was seeking to introduce not only Jackson's failure to appear at these court dates but also the underlying criminal offense associated with these court dates. He argued that the evidence of Jackson's multiple arrests, multiple bonds made it look as if he was on a crime spree, and the prejudice regarding this evidence substantially outweighed its probative value.

At the conclusion of the hearing, the trial court held that it was going to allow the State to introduce evidence that Jackson "was on bond before July 2010 and that he had made all of his appearances up until that point in time, but when he had his court appearances in July, he failed to appear in court pursuant to the bond requirements[.]" However, the court stated that it would not allow the State to present evidence regarding the details of Jackson's multiple arrests and subsequent bonds because it was fearful that this information would "suggest a continuing crime spree" to the jury. It added, "[T]he fact that there [are] other pending charges has nothing to do with this case, and no probative value."

Following Jordan's testimony at trial, the trial court gave the following Rule 404(b) curative instruction to the jury:

> If you find from the proof that the Defendant had been charged with another offense other than the one for which he is on trial, you cannot speculate as to what that offense was or that being charged with the other offense in any manner suggests that Mr. Jackson has a propensity to commit the offense for which he is now on trial. This evidence may be considered by you only on the issue of Mr. Jackson's intent. That is, such evidence may be considered by you if it tends to establish that Mr. Jackson actually intended to commit the theft to which he is now being tried.

The court gave a similar instruction after Jackson testified and gave the standard 404(b) jury instruction at the close of all the proof.

Here, the record does not show whether the State or the defense requested the jury-out

hearing, although it is clear that only the State filed a motion regarding these unrelated crimes. However, the record does show that Jackson failed to argue at the jury-out hearing that his missed court appearances for these unrelated crimes were inadmissible as prior bad acts pursuant to Rule 404(b). Although Jackson argued in his motion for new trial that the trial court erred by allowing Jordan to testify about information associated with his prior, unrelated crimes, he failed to argue that this evidence was inadmissible pursuant to Rule 404(b). Relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." See Tenn. R. App. P. 36(a). Moreover, "A party may not raise an issue for the first time in the appellate court." State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995). In addition, at the jury-out hearing Jackson failed to request that the trial court state the material issue other than conduct conforming to a character trait, its ruling, and the reason for admitting the evidence. See Tenn. R. Evid. 404(b)(2). For these reasons, Jackson has waived this issue.

Waiver notwithstanding, we conclude that Jackson was not prejudiced by the admission of his missed court dates on unrelated charges because this evidence was probative of Jackson's intent to deprive Budget of its rental car. The trial court limited this evidence to the fact that Jackson was on bond in an unrelated case before July 2010 and had made all of his court appearances until he missed two court dates in July. In addition, the court specifically precluded the State from presenting proof regarding the details of the underlying crimes because it was fearful that this information would "suggest a continuing crime spree" to the jury. Moreover, the court instructed the jury multiple times that they were not to use the evidence of these unrelated offenses to infer that Jackson had the propensity to commit the charged offense in this case. We must presume that the jury followed these instructions. State v. Reid, 164 S.W.3d 286, 342 (Tenn. 2005) (citing State v. Hall, 976 S.W.2d 121, 148 (Tenn. 1998)).

Finally, based on the record, we conclude that admission of Jackson's missed court dates does not rise to the level of "plain error." See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); Tenn. R. Evid. 103(d) ("Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is

"necessary to do substantial justice."

Adkisson, 899 S.W.2d at 641-42 (internal footnoted omitted). As we previously stated, the evidence of Jackson's missed court dates was probative of his intent to deprive Budget of its rental car. Moreover, as we noted above, the court severely limited the details regarding this evidence. Jackson has failed to show that a clear and unequivocal rule of law was breached, that a substantial right was adversely affected, or that consideration of the error is necessary to do substantial justice. Therefore, we conclude that Jackson is not entitled to plain error relief.

**III.** **Admission of Darr's Testimony Regarding the Loss Sustained.** Jackson argues that the trial court erred in admitting Darr's testimony about the amount of loss incurred by Budget because it was inadmissible hearsay. He claims that Darr's testimony regarding the $2,376.95 was based on solely information from the loss prevention department that was unsupported by any documentation other than the missing vehicle report that showed a towing fee of $626.60. In addition, Jackson claims this evidence does not meet the business record exception under Tennessee Rule of Evidence 803(6) because no records were introduced to support Darr's loss figure and the State failed to lay a proper foundation for declaring Darr a custodian or other qualified witness pursuant to Rule 803(6). He claims that Darr was not a proper custodian for these business records because Darr admitted that he had no idea how the loss prevention department calculated the damage to the rental car and could not explain why the loss prevention department concluded that there was $642.88 in damage to the car while the Missing Vehicle Report stated that there was no damage to the car. Moreover, Jackson asserts that the court improperly concluded that Darr was a proper custodian for the business records because he was under the mistaken impression that Darr was "over loss prevention," despite the fact that Darr had testified that he was a Middle Tennessee territory performance manager for Avis Budget Group and that he only got involved with the loss prevention department when additional action was needed to recover one of Budget's vehicles.

The State argues that the trial court did not abuse its discretion in admitting this evidence because Darr's testimony was consistent with the types of statements contemplated by Rule 803(6). The State also argues that even if the trial court erred in admitting this evidence, the error is harmless because Jackson failed to prove that admission of this evidence more probably than not affected the outcome of his trial. Moreover, the State asserts that the jury would have concluded that Jackson deprived Budget of more than $1000 even without the evidence of the loss calculated by the loss prevention department because Darr testified that the rental cost for the Impala was $31.96 a day and that Jackson prevented Budget from receiving rent on this vehicle from July 10, 2010, to August 12, 2010. We agree with the State.

-16-

At trial, Darr testified that he was a Middle Tennessee territory performance manager for Avis Budget Group in Nashville. He stated that managed and supervised all of the corporate locations within the Middle Tennessee district and handled situations in which rental cars were not returned. He also stated that when a customer fails to return a Budget car on time, he works with the loss prevention department to recover the car.

When the State asked Darr about the value of the rental car in this case, the defense objected because the State failed to lay the foundation that Darr knew the value of the car. The State asserted that Darr was "a manager at Budget" and "is clearly qualified to testify about the value of a car that his company owns." The court held that it was "going to allow the testimony on the basis that he is over loss prevention, and that department is responsible in case of loss of recovering its value, so I think he can testify as to that." The court added that Darr could be asked questions on cross-examination regarding the accuracy of the value to which he testified. Defense counsel requested that he be allowed to make objection on the record regarding the lack of foundation at the next break.

When Darr continued his testimony in the presence of the jury, he confirmed that Budget owned the Chevrolet Impala rented by Jackson. He stated that he assisted the loss prevention department in recovering any Budget cars that were not returned and in calculating the loss regarding such vehicles. Darr said that he regularly obtained arrest warrants if cars were not returned. He said he received the value of the unreturned cars from Budget's corporate loss prevention department and that Budget, as the owner of the entire fleet, kept a record of the value of its cars as a business practice. He then testified that the value of the car rented by Jackson was $26,998.

Darr stated that for the period of time the car was missing, Budget incurred losses because it was unable to rent that car to other customers. He stated that the loss prevention department calculated the amount of loss incurred by Budget for its inability to rent the car while it was missing. When Darr was asked the specific amount of that loss, defense counsel objected on the ground of hearsay, and the court immediately overruled the objection. After referring to the records provided to him by Budget's corporate loss prevention department, Darr testified that Budget's loss was $2,376.95, which included lost rental expenses, towing and storage fees, recovery fees, damage costs, and fuel expenses.

During a bench conference following Darr's testimony, defense counsel objected to the State's failure to lay a proper foundation for Darr's testimony regarding Budget's loss regarding the rental car. He asserted that Darr "ended up testifying to hearsay[,] and I'm going to object to it." The court noted that Darr had explained that "the value that he relied upon came from corporate." Defense counsel replied, "But that's hearsay. And my objection

is to the ownership."

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. "'The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court.'" State v. Thomas, 158 S.W.3d 361, 400 (quoting State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001)). This court will not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record.[1] Franklin, 308 S.W.3d at 809 (citing Lewis, 235 S.W.3d at 141).

The State asserts that Darr's testimony was admissible under the business records exception in Rule 803(6), which states that the following records are not excluded by the hearsay rule:

---

[1] The Tennessee Supreme Court has concluded that the appropriate standard of review for the admissibility of hearsay evidence is abuse of discretion. See State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008) (concluding that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record"); Pylant v. State, 263 S.W.3d 864, 871 n.26 (Tenn. 2008) ("Although this Court continues to believe that questions concerning the admissibility of [hearsay] evidence are reviewed under an abuse of discretion standard, we note that, in this instance, the post-conviction court committed error under either standard of review."). However, several panels of this court have repeatedly concluded that the appropriate standard of review for the admissibility of hearsay evidence is de novo without a presumption of correctness. See State v. Gilley, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (holding that whether a statement is offered to prove the truth of the matter asserted is "necessarily a question of law" and is not subject the abuse of discretion standard of review); State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007) (concluding that "a trial court's ruling on whether a statement is hearsay is a question of law, and the appellate court reviews the issue de novo without a presumption of correctness"); State v. Brandon M. Cartwright, No. W2010-01253-CCA-R3-CD, 2011 WL 2410370, at *3 (Tenn. Crim. App. June 10, 2011) (stating that "[d]espite the recent supreme court cases utilizing the abuse of discretion standard, we conclude that the trial court's determination whether a statement should be excluded as hearsay should be reviewed de novo"); Tony A. Phipps v. State, No. E2008-01784-CCA-R3-PC, 2010 WL 3947496, at *9 (Tenn. Crim. App. Oct.11, 2010) ("We are mindful that a trial court's ruling on whether a statement is hearsay is a question of law, and the appellate court reviews the issue de novo without a presumption of correctness."); see also Willie Perry, Jr. v. State, No. W2011-01818-CCA-R3-PC, 2012 WL 2849510, at *7 (Tenn. Crim. App. July 11, 2012) (Bivins, J., concurring) (applying a de novo standard of review to the hearsay issue after noting that the Tennessee Supreme Court had not yet overruled or modified Gilley). In this case, we conclude that the evidence is admissible under either the abuse of discretion or de novo without a presumption of correctness standard of review. See State v. Russell Dean Long, No. E2012-01166-CCA-R3-CD, 2013 WL 5436529, at *25 n.2 (Tenn. Crim. App. Sept. 27, 2013) ("It is not necessary for us to compare the merits of each position because, for purposes of our determination of this issue, the evidence is admissible under either standard of review.").

**Records of Regularly Conducted Activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

Tenn. R. Evid. 803(6).

We note that in this case, the record calculating the loss was never entered into evidence, and Darr simply testified to the amount of Budget's loss regarding the rental car from the record provided to him by Budget's corporate loss prevention department. The purpose of the business records exception "is to facilitate the use of business records by eliminating the expense and inconvenience of calling numerous witnesses involved in the preparation and maintenance of the records." Alexander v. Inman, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995) (citations omitted); State v. Kacy Dewayne Cannon, No. E2011-02624-CCA-R3-CD, 2012 WL 6049639, at *22 (Tenn. Crim. App. Dec. 5, 2012), perm. app. denied (Tenn. April 10, 2013). This hearsay exception "rests on the premise that records regularly kept in the normal course of business are inherently trustworthy and reliable." Inman, 903 S.W.2d at 700 (citing Hill v. National Life & Accident Ins. Co., 11 Tenn. App. 33, 37-38 (1929); 5 John H. Wigmore, Evidence in Trials at Common Law § 1522 (James H. Chadbourn rev. 1974); Neil P. Cohen et al., Tennessee Law of Evidence § 803(6).1 (2d ed. 1990)).

Rule 803(6) also requires that the foundation for admission of the introduced documents be provided by a "custodian or other qualified witness." Tenn. R. Evid. 803(6). The Tennessee Court of Appeals held that:

[t]he term "qualified witness" should be given a broad interpretation. To be considered qualified, a witness must be personally familiar with the business's record-keeping systems and must be able to explain the record-keeping procedures. The witness is not required to have personal knowledge of the facts recorded, to have been involved personally in the preparation of the records, or even to know who actually recorded the information.

-19-

Id. (internal citations omitted); see Kacy Dewayne Cannon, 2012 WL 6049639, at \*22.

We conclude that Darr's testimony of Budget's loss regarding the rental car from the loss prevention report was admissible under Rule 803(6). See State v. Cannon, 254 S.W.3d 287, 303 (Tenn. 2008) (noting that if records meet the business records exception to hearsay, then such records are "properly categorized as nontestimonial" and the Confrontation Clause does not apply). The report was completed by Budget as a regular business practice, and Darr was a proper custodian to testify about the evidence contained within the loss prevention department's report. See State v. Jeremy McMillon, No. E2010-01091-CCA-R3-CD, 2011 WL 4424732, at \*8 (Tenn. Crim. App. Sept. 22, 2011) (concluding that the doctor's testimony about an autopsy report that noted the discovery of a bullet on the floor below the victim's body was admissible under Rule 803(6), despite the fact that the doctor was not present when the bullet was found, because the doctor assisted in the autopsy and testified not only about the report's creation but also about the discovery of the bullet and a second doctor who prepared the report testified at trial). Moreover, Jackson did nothing to call the trustworthiness of this record into question. See State v. Clois Dean Asbury, No. E2008-01641-CCA-R3-CD, 2010 WL 1741365, at \*9 (Tenn. Crim. App. Apr. 30, 2010) (asserting that "[t]he State need not produce more evidence of the trustworthiness of the [business] records unless the defense produces evidence calling it into question"). While we would have preferred for the State to have entered the report concerning Budget's loss into evidence, we conclude that the trial court did not abuse its discretion in allowing the State to introduce this evidence at trial.

We also agree with the State that if the trial court erred in allowing Darr's testimony regarding Budget's loss from the report, this error was harmless because the jury could have concluded that Jackson deprived Budget of $1000 or more without the evidence of the loss calculated by the loss prevention department. We note that Darr testified, without objection from the defense, that Jackson's rental fee for the Impala was $31.96 a day and that Jackson prevented Budget from receiving rent on this vehicle from July 10, 2010, to August 12, 2010. Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."); State v. Dotson, 254 S.W.3d 378, 388 (Tenn. 2008). Accordingly, Jackson is not entitled to relief on this issue.

**IV. Sentencing.** Jackson argues that the trial court abused its discretion in sentencing him to six years in confinement and in denying him an alternative sentence. He contends that because this was a non-violent offense and Budget regained possession of their rental car, an alternative sentence with restitution or a sentence that was the minimum sentence in the applicable range would have been a more suitable punishment. The State responds that

Jackson has failed to overcome the presumption that his sentence is reasonable and has failed to show that the trial court abused its discretion because the record reflects that the sentence was consistent with the purposes and principles of sentencing.

We note that the 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. This abuse of discretion standard of review also applies to a trial court's decision regarding "probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a sentence of confinement, the Defendant has failed "to either establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded sentences which reflect a proper application of the purposes and principles of our statutory scheme." Id. at 280.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Comments. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103. In addition, the court must impose a sentence "no greater

than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

Jackson argues that the trial court erred in refusing to grant some form of alternative sentencing. Tennessee Code Annotated section 40-35-102(6)(A) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" However, the trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). Id. § 40-35-102(6)(D). A trial court should consider the following when determining whether an individual should receive alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

We note that Jackson was eligible for probation because his actual sentence was ten years or less and the offense for which he was sentenced was not specifically excluded by statute. See T.C.A. § 40-35-303(a). A trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. Id. § 40-35-303(b). No criminal defendant is automatically entitled to probation as a matter of law. Id., Sentencing Comm'n Comments; see State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). Instead, the defendant must demonstrate that probation would serve "the ends of justice and the best interests of both the public and the defendant." State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (citations omitted).

When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, the defendant's present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public. See State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citing State

v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978)). In addition, the Tennessee Supreme Court has held that truthfulness is a factor that the court may consider in deciding whether to grant or deny probation. State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983) (citing State v. Poe, 614 S.W.2d 403, 404 (Tenn. Crim. App. 1981)).

Here, the trial court stated that in determining the appropriate sentence for Jackson, it considered the evidence presented at sentencing and trial, the presentence report, the sentencing principles in Code section 40-35-103, arguments made as to sentencing alternatives, the nature and characteristics of Jackson's criminal conduct, the evidence related to enhancement and mitigating factors, Jackson's testimony at trial, Jackson's potential for rehabilitation and treatment, and the general purposes of the sentencing act in Code section 40-35-102.

The court determined that Jackson was a Range II, multiple offender, so he was not considered as a favorable candidate for an alternative sentence. See T.C.A. §§ 40-35-106, -102(6)(A). The presentence report showed that Jackson had been convicted of felony evading arrest and possession of cocaine with the same offense date and two counts of aggravated assault with the same offense date. Jackson was also convicted as a juvenile of robbery, two counts of theft with the same offense date, and aggravated burglary and criminal trespass with the same offense date. The court acknowledged that several of these convictions had occurred within the same twenty-four hours but asserted that the two aggravated assaults were considered separate convictions because they were violent offenses. See id. § 40-35-106(b)(4). Because Jackson had been convicted of a Class D felony, he was subject to a sentence of four to eight years. See id. § 40-35-112(b)(4).

The court applied the enhancement factor that Jackson had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]" Id. § 40-35-114(1). In addition, the court applied the enhancement factors that Jackson was on bail for other offenses at the time he committed the offense in this case and that Jackson committed acts as a juvenile that would constitute a felony if committed by an adult. See id. § 40-35-114(8), (16). The court applied the mitigating factor that Jackson's criminal conduct "neither caused nor threatened serious bodily injury[.]" Id. § 40-35-113(1).

Regarding whether to grant an alternative sentence, the court found that although Jackson's present mental and physical condition were fine and would not interfere with his ability to serve an alternative sentence, the court found that his work and educational history were "somewhat spotty" because he spent time in the penitentiary and, other than the chauffeur service that he testified to at trial, he had worked in only a couple of unverified jobs. The court noted that Jackson had graduated from high school before earning some

additional training while at the Turney Center." The court stated that Jackson's social history was a neutral factor because although Jackson seemed to try to be productive, he had marital issues, and his job was associated with the adult entertainment business. Regarding family support, the court noted that although Jackson had a number of family members in the Nashville area, he did not know where his mother was living, he had marital problems, and he had no family members to testify on his behalf at trial or at sentencing. The trial court stated that based on the presentence report Jackson did not appear to have issues with alcohol or drugs and did not appear to have mental issues, so it found that "compliance with those treatment principles" was not relevant to this case. Regarding Jackson's candor, the court stated that while it "could understand maybe initially how this thing [with the rental car] started to unfold," it found Jackson's "version of events to become less and less credible, particularly after he got the car and . . . just didn't turn around and address what he says was an honest mistake." The court noted that Jackson had not had the opportunity to commit any other crimes since his arrest because he had been incarcerated. In addition, regarding the financial and emotional support of his children and significant others, the court found that although "[Jackson] was doing all right for a while" he "just kind of floated out in California" for at least two or three months without contacting his family.

The court, recognizing that the sentencing act gives priority for sentences involving incarceration to convicted felons who commit the most severe offenses and who have criminal histories evincing a clear disregard for the laws and morals of society, found that while Jackson had not committed one of the "most severe offense[s,]" he had failed at past efforts of rehabilitation and still had some problems. See id. § 40-35-102(5). In addition, the court recognized that although the sentence imposed should be the least severe measure necessary to achieve the purpose for which it is imposed, it found that given all the circumstances, including Jackson's lack of familial support, alternative sentencing was not appropriate in this case. See id. § 40-35-103(2). Significantly, the trial court noted that Jackson had an extensive criminal history and had "jumped bail" and had "violated probations" in the past. See id. § 40-35-103(1)(A), (C). Consequently, the court sentenced him as a Range II, multiple offender to six years at thirty-five percent in confinement. It stated that it was giving him some credit for the fact that although this was a theft, there was evidence sufficient for the jury to conclude that it was committed under "somewhat unusual circumstances." The court also ordered that Jackson pay restitution to Budget in the amount of $2,376.95.

The record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a within-range sentence of confinement in this case. Accordingly, we conclude that the trial court did not abuse its discretion in imposing an effective sentence of six years in confinement.

## CONCLUSION

Upon review, we conclude that the evidence is sufficient to sustain Jackson's conviction for theft of property valued at $1000 or more but less than $10,000, that the trial court acted within its discretion in admitting evidence of his missed court dates and in admitting evidence regarding Budget's loss regarding the rental vehicle, and that the sentence in this case was not excessive.

_____
CAMILLE R. McMULLEN, JUDGE